IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

CELESTE C. GRYNBERG,
derivatively for BG GROUP P.L.C., a United Kingdom
corporation,

    Serve at : Prentice Point, Suite 500, 5299 DTC Blvd.,
Greenwood Village, CO 80111, U.S.A.,

                       Plaintiffs,

        v.

BG GROUP P.L.C.,
   Serve at: 100 Thames Valley Park Drive, Reading
Berkshire, England;
d/b/a BG  AMERICAS & GLOBAL LNG, a Texas
corporation,
   Serve at: CT Corporation Systems, 350 N. St. Paul
Street, Dallas, TX 75201 USA;
ROBERT WILSON,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
FRANK CHAPMAN,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
ASHLEY ALMANZA,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
JURGEN DORMANN,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
MARTIN HOUSTON,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
DAVID MANNING,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
PHILIPPE VARIN,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
PETER BACKHOUSE,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
SARAH HOGG,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
JOHN HOOD,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA);
COLIN SHARMAN,
   Serve at: BG Americas & Global LNG, Suite 1200,
5444 Westheimer, Houston, Texas, 77056 (USA),

                     Defendants.

NO.

## SHAREHOLDER DERIVATIVE COMPLAINT

    Plaintiff, Celeste C. Grynberg, by her attorneys, allege for her Shareholder Derivative Complaint, upon personal knowledge and upon information and belief, as follows:

## I. <u>INTRODUCTION</u>

1.      This is a derivative action brought on behalf of shareholders of BG GROUP P.L.C., ("BG the "Company," or the "Nominal Defendant"), BG NORTH AMERICA, LLC, a Texas corporation, to redress systematic wrongdoing by directors, officers, and attorneys of the company, that occurred in connection with a massive scheme involving illegal and criminal bribes paid to various top officials of the Government of Kazakhstan, and the scheme to cover up those bribes from public disclosure through a series of misrepresentations.  There have been many victims of these bribes and their cover up – beginning with the People of Kazakhstan who have been denied their right to the benefits of the resources extracted from their land and the right to the honest services of their governmental officials of the bribes and the cover-up.  The company and its shareholders are among the scheme's victims.

2.      Plaintiff brings this action derivatively for BG, of which she is a shareholder representative. BG and all of its shareholders were damaged by Defendants' acts and omissions described herein and continue to be damaged to the date of the filing of this Complaint, and will be in the future.  The wrongs committed by the Defendants are part of a continuing course of action perpetrated by the Defendants.

3.      This lawsuit arises from Plaintiff's discovery that Defendants have engaged in illegal and criminal bribery schemes, and in attempting to cover up those illegal and criminal bribes, have lied to Plaintiffs and to its shareholders, withheld evidence, with trickery have forced shareholders, without their knowledge, consent or approval, to pay a portion of those illegal bribes out of the profits that the shareholders should have shared in.

4.      This action seeks equitable and declaratory relief and damages as remedies for Defendants' breach of their fiduciary duties to the Company and its shareholders.

5.      Defendants, by the actions complained of herein, have breached their duties of care and loyalty to the Company and its shareholders by acting in their own self interests and abusing the trust which the Company's shareholders have placed in them. Defendants'

wrongdoing has irreparably damaged the Company and its shareholders.

## II. JURISDICTION AND VENUE

6.      Subject matter jurisdiction is appropriate in this action pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 because BG maintains operations in Dighton, Massachusetts, County of Bristol, which is located within this District.

8.      Jurisdiction over the Defendants named herein is proper by virtue of *inter alia*, the trading of American Depositary Shares (ADR's) on the New York Stock Exchange until September, 2007, at which time BG de-listed itself in likely avoidance (see below allegations) to the Sarbanes-Oxley Act.  An American Depositary Share is a U.S. dollar-denominated form of equity ownership, representing ordinary shares on deposit in the United Kingdom.  An American Depositary Share carries significant rights arising out of those ordinary shares.  For example, it confers the right to receive dividends in U.S. dollars, the right to attend shareholder meetings, and the right to vote on important matters before the company. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2nd Cir. 2000) *cert. denied* 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001).

## III. THE PARTIES

9.      Plaintiff Celeste C. Grynberg, a resident of Colorado, was at all times relevant hereto, and remains, a shareholder of the Company.

10.     The Nominal Defendant, BG did business in the United States until September, 2007, by selling shares on the New York Stock Exchange. BG conducts operations in the United States through its wholly-owned subsidiary, BG Americas & Global LNG, in Houston, Texas and elsewhere. BG is a United Kingdom corporation located in Reading, England. BG has operations in Europe, North and South America, Australia, Africa, Asia and the former Soviet Union.

11.     Wilson is a Director and the Chairman of BG and BG Americas & Global LNG.

12.     Chapman is a Director and the Chief Executive Officer of BG and BG Americas & Global LNG.

13.     Almanza is a Director and Chief Financial Officer of BG and BG Americas & Global LNG. He is responsible for BG finance, tax, treasury, investor relations, M&A, internal audit and secretariat.

14.     Dormann is a non-executive Director of BG and BG Americas & Global LNG.

15.     Houston is an executive Director of BG and BG Americas & Global LNG, and Executive Vice President. He is responsible for BG activities in North and South America, Trinidad and Tobago, and BG's Global LNG activities.

16.     Manning is a non-executive Director of BG and BG Americas & Global LNG.

17.     Varin is a non-executive Director of BG and BG Americas & Global LNG.

18.     Backhouse is a non-executive Director of BG and BG Americas & Global LNG.

19.     Hogg is a non-executive Director of BG and BG Americas & Global LNG.

20.     Hood is a non-executive Director of BG and BG Americas & Global LNG.

21.     Sharman is a non-executive Director of BG and BG Americas & Global LNG.

### IV. GENERAL ALLEGATIONS

### Discovery of the Vast Caspian Potential

22.     Beginning late 1989 and early 1990, as the Soviet Union began showing signs of possible collapse or decentralization, the vast potential for oil and natural gas exploration, development, production, and exploitation in Kazakhstan's petroleum fields, both onshore and offshore in the adjacent northeastern Caspian Sea, referred to as the "Area of Mutual Interest" (hereinafter, "AMI"), became the focus of intense interest by BPX, Statoil, BG, Total, Shell, ENI and others.

23.     BG, BPX, Statoil and others formed alliances with Kazakhstan. In June of 1993, BG joined Kazakhstancaspiishelf ("KCS") consortium, a partnership consisting of the Kazakhstan Government and several multinational oil companies. KCS would be redesignated,

in 1997, as the Offshore Kazakhstan International Operating Company ("OKIOC") by which it is currently known. A new agreement and restructuring of OKIOC was signed on October 31, 2008 to exploit the offshore Caspian Sea potential, known as the Greater Kashagan Area.

24.     In or about November of 1997, BG, entered into a Production Sharing Agreement ("PSA") with Kazakhstan in connection with the giant Kashagan Oil and Natural Gas Field.  As part of the transaction, the oil companies agreed to pay (along with its 50% partner) $17 million into a Swiss escrow account, purportedly for the purpose of paying the fees of certain, so-called "advisors" for Kazakhstan in connection with the transaction. This payment is highly questionable and has been hidden by BG. It is likely a violation of both the Travel Act and Foreign Corrupt Practices Act, and their British and European Union equivalents.

25.     The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3, 78ff, the Interstate and Foreign Travel to Aid Racketeering, 18 U.S.C. § 1952, and Engaging in Monetary Transactions in Proceeds from Specified Unlawful Activities, 18 U.S.C. § 1957, not only bar this type of conduct directly but at the same time compel both the Company and shareholders to take independent action to disassociate themselves, in their beneficiary capacity, from these illegal acts by the directors, officers, and attorneys of the company.  As a forced and innocent victim in the payment of approximately $90,000,000.00 of illegal payments to foreign government officials, failure to take the necessary steps to seek immediate return of these funds and disavowal in such practices might potentially expose the Company to future risk and costs associated with the ongoing United States Department of Justice ("DOJ") criminal investigations against each of the oil and gas company Defendants.

26.     Approximately $40 million in unspecified expenses has also been located within documents classified as "production sharing fees." Standard international production sharing contracts pay production sharing fees only from actual petroleum production and not before any oil and natural gas production begins. The so-called "production sharing fees" of approximately $40 million are, more likely than not, illegal and criminal bribe payments.

6

27.    Given these facts, one can understand why Chevron, though courted by the consortium, did not participate in OKIOC. Chevron correctly viewed the $40 million "entrance fee" as an illegal bribe demand.

28.    On information and belief, a $100 million entrance fee was charged by the Government of Kazakhstan to BG and AGIP/ENI, the publicly-owned, Italian international energy corporation, to become joint operators in Karachaganak in 1993. On information and belief, following acceptance of a bid of $500 million against BP, BG and AGIP/ENI were required to kick back a $100 million "loan", or $50 million each, a sum which was never reported to shareholders.

29.    James H. Giffen ("Giffen") was the principal and CEO of Mercator Corporation ("Mercator"), a New York corporation owned by Mr. Giffen, which advised the Republic of Kazakhstan throughout the 1990's and early 2000's in connection with various transactions related to the sale by Kazakhstan of portions of its oil and natural gas wealth.

30.    On March 30, 2003, Giffen was arrested at Newark Airport attempting to flee the United States, served with a criminal grand jury indictment, and is now awaiting trial after posting $10,000,000.00 bail, in U.S. v. Giffen, 03-MJ-663, S.D.N.Y. (March 2003). *See* Exhibit 1. Giffen was notorious for his part of a scheme to pay off high Kazakh government officials to smooth the way for the original KCS Concession Agreement. On May 12, 2008, The *Wall Street Journal* reported that Dariga Nazarbayeva, Kazakhstan President Nazarbayev's daughter, through her company, World Media Corp., had interfered with the DOJ investigation, showing how concerned the Kazakhstan Government was with the prosecution of Mr. Giffen. *See* Exhibit 2.

**Known Criminal Activities**

31.     In May of 2007, the DOJ cooperating with Swiss authorities, confiscated some $84 million previously held in Swiss bank accounts owned by several top Kazakhstan government officials connected with Caspian Sea-related licensing and operations, which the DOJ had previously frozen with assistance of the Swiss criminal authorities. These monies were earmarked and frozen by the DOJ as having been paid on behalf of Western oil and gas companies in securing the very contracts at issue in the Greater Kashagan Oil Field.

32.     The OKIOC was composed of seven (7) major multinational oil companies. The $84 million in frozen funds is easily divisible by seven (7), indicating the original BG share of the bribe money was $12 million.

33.     The Giffen indictment, combined with other DOJ prosecutions, point to a pattern of criminal acts by members of OKIOC only possible through ineffectual internal auditing and other lax standards, cited as matters of public record (see below), endemic to all participants the international consortium, and required as a means of securing valuable licenses from various states including Kazakhstan.

34.     Examples of these universal practices in the region are as follows:

**i. Statoil/Hydro**

35.     On October 11, 2006, Statoil/Hydro entered into a Deferred Prosecution Agreement with the DOJ, paying a penalty of $10.5 million for violations of the Foreign Corrupt Practices Prevention Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3, 78ff, as to Iranian government petroleum officials. Moreover, following the recent merger of Statoil ASA with Norsk Hydro ASA, and fearing violation of the October, 2006 Deferred Prosecution Agreement, the President and CEO of Statoil/Hydro, Eivind Reiten, resigned on October 5, 2007 after admitting the concealment of illegal payments to Libyan Government petroleum officials, between 1999 and 2001 (when he was President and CEO of NorskHydro), from the Norwegian National Authority for Investigation and Prosecution of Economic and Environmental Crime.

36.     Statoil's Deferred Prosecution Agreement with the DOJ (see Para. 55 supra) described the following wrongdoing:

(a)   In June 2002 and January 2003, Statoil paid bribes to an Iranian government official (the "Iranian Official") in order for him to use his influence to: (i) assist Statoil in obtaining a contract to develop three phases of the South Pars oil and gas field in Iran (the "South Pars Project") and (ii) open doors to additional projects in the Iranian oil and gas exploration industry.

(b)   Statoil agreed to pay the Iranian Official through a consulting contract (the "Contract") with an intermediary company (the "Consulting Company") organized in the Turks and Caicos Islands and nominally owned by a third party located in London, England.

(c)   The Contract obligated Statoil to make initial payments of $200,000 and $5 million, and ten subsequent annual payments of $1 million each.

(d)   In October 2002, Statoil obtained the contract to develop the South Pars Project.

(e)   During the relevant time period, Statoil employees circumvented Statoil's internal controls and procedures that were in place to prevent illegal payments, and Statoil lacked sufficient internal controls.

(f)   In addition, by mischaracterizing the payments as legitimate consulting fees, Statoil violated the books and records provisions of the federal securities laws.

*Order Instituting Cease and Desist Proceedings, Making Findings, and Imposing a Cease and Desist Order, dated October 13, 2006, pg. 2. ("Cease and Desist Order"). See* Exhibit 3.

37.     The Cease and Desist Order determined that Statoil was subject to U.S. prosecution based on the following activities within the forum:

Statoil is a public company organized under the laws of the Kingdom of Norway and headquartered in Stavanger, Norway. Statoil explores for and develops oil and gas resources around the globe, and has American Depositary Shares that trade under the symbol STO on the New York Stock Exchange and are registered pursuant to Section 12(b) of the Exchange Act (15 U.S.C. § 78l(g)). Statoil is required to file reports with the Commission under Section 13 of the Exchange Act (15 U.S.C. § 78m), and is an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-l.

*Id*.

38.     The Cease and Desist Order therefore found the following violation of the Foreign Corrupt Practices Prevention Act, 15 U.S.C. §§ 78a, 78dd-1 to 78dd-3, 78ff ("FCPA") and of

Sections 12(b)(2)(A) (making and keeping of books, records and accounts) and 30A (prohibiting giving anything of value to foreign officials for purposes of influencing their decisionmaking) of the Exchange Act:

> Statoil failed to properly account for the illegal payments and failed to accurately describe the Contract in its books and records. Instead, Statoil improperly characterized the payments it made as legitimate payments for "consulting fees for special consultants and analyses relating to technical, administrative, tax, and financial matters...," and improperly characterized the Contract as an ordinary consulting agreement.

*Cease and Desist Order, pg. 5.*

39.     Therefore, despite a 2003 internal report describing bribes paid to the Iranian Government Official, "Statoil's senior management failed to take appropriate action to address the Contract and Statoil's relationship with the Iranian Official." *Cease and Desist Order, pg. 6.*

40.     The Cease & Desist Order imposed the following remedial steps, composed of an internal watchdog system subject to DOJ oversight, as a condition of terminating the criminal matter against Statoil:

(a)   Maintain independent compliance consultant.

(b)   Cooperate fully with compliance consultant.

(c)   Compliance consultant to assess whether Statoil/Hydro policies and procedures are reasonably designed to *detect and prevent* violations of FCPA.

(d)   Compliance consultant shall be required to furnish a written report within 120 calendar days.

(e)   Within 120 days after receiving report Statoil/Hydro shall adopt all recommendations.

(f)   Compliance consultant shall undertake two follow up reviews.

(g)   Compliance consultant shall formulate conclusions.

(h)   Compliance consultant shall report any evidence of bribery to

corporate compliance officer and DOJ; Statoil shall not retaliate for such disclosures.

(i)   The C&D does not affect Norwegian jurisdiction.

(j)   Compliance consultant shall conduct no other business with Statoil/Hydro and shall have a fixed two-year term of employment; Statoil/Hydro shall not terminate said compliance consultant without written approval of DOJ.

## ii. BPX

41.     BPX has been mentioned in connection with violations of the Foreign Corrupt Practices Act in Azerbaijan, another country bordering the Caspian Sea. After being terminated abruptly as CEO of BP in May, 2007 Lord John Browne, declared a felon by the United Kingdom High Court, was also implicated by a high-level BP employee in a multi-million dollar criminal bribery scheme to unlawfully influence Azerbaijani government officials in a pattern similar to the unlawful activities uncovered by the DOJ in Kazakhstan. Les Abrahams, who led BP's successful bid for the Azerbaijan Concession, recently stated publicly that line item expenditures on BP's books were not always what they seemed. For example, an £8 million payment to SOCAR, Azerbaijan's state-owned oil company, for the right to use a construction yard on the Caspian Sea was a cover for bribes to top Azerbaijani Government officials. Furthermore, the £45 million for first year costs in Baku (capital of Azerbaijan), covered up £5 million in direct bribes to "key local figures in Baku." *Quoted from* Our Man In Baku; Les Abrahams with Nicholas Monson; *as reported by* Glen Owen, Hookers, Spies, Cases Full Of Dollars…How BP Spent £45m To Win 'Wild East' Oil Rights; UK Daily Mail; May 13, 2007. *See* Exhibit 4.

## iii. Sale of BG's interest in the Greater Kashagan Field

42.     The uniquely criminal nature of the activities described above, and the DOJ's focus on James H. Giffen as the cornerstone of this criminal conspiracy, throws harsh light on

the rampant irregularities and outwardly poor decisionmaking in BG's sale of its Greater Kashagan 16.66% interest.

### The Transaction

43.     The April 9, 2005 sale of BG's 16.66% interest in the Offshore Kazakhstan International Oil Company (OKIOC) for $1.8 billion was on its face contrary to the interests of the shareholders of BG.  To date, the reasons given for the sale are both flimsy and illogical.

44.     The price was inadequately small, suggesting that the deal resulted from inadequate review by the Board in violation of its fiduciary duties.  This conclusion is based on the fact that Exxon Mobil, Shell Oil, Total, ENI, INPEX of Japan and ConocoPhillips, all competent international oil companies, have not sold any of their interests and in fact have, each of them, moved to exercise their preemptive, pro-rata acquisition rights. Indeed, for years, Exxon tried to get into OKIOC and was ultimately able to do so only by purchasing Mobil.

45.     The indications are that the Greater Kashagan oil discovery could hold 30 billion barrels of recoverable oil reserves, together with 70 trillion cubic feet (2 trillion cubic meters) of associated natural gas and hundreds of millions of tons of elemental sulphur.  By some accounts, Kazakhstan's oil reserves could come to a stunning 305 billion barrels of recoverable oil - more than the reserves of Iran or Kuwait.  The Kashagan West well, the second well on the Kashagan Carboniferous Reef 40 miles to the West of the discovery well, the Kashagan East #1 well, tested 3,400 barrels of highly marketable 42-45° API oil and 7.6 million cubic feet of associated natural gas per day.  The recoverable oil reserves are widely accepted to be more than currently proven, considering past experience with other giant reserves in the region.  When completed, each of these wells can flow from limited perforations, 50,000 barrels of oil per day. Furthermore, no oil-water contact has ever been found in the massive Kashagan reef.

46.     Kazakhstan's oil reserves may be far more still. The above is based on oil to be recovered from the Carboniferous formation. However, it is widely known that the Pricaspian Basin has discoveries in the deeper Devonian reef formation below the Carboniferous Reef,

which have not been penetrated and tested to date in Kashagan. This information is well known to BG, which tested the Devonian in at least three (3) wells in the Karachaganak Field where it is the joint operator with AGIP/ENI. It is also known in the industry that the OKIOC has a stated multiyear drilling contract for a 25,000 foot $90,000,000 drilling rig with Deutag Drilling Company to move the rig to Kashagan, obviously to test the potential Devonian which would drastically increase the recoverable oil reserves of the Greater Kashagan's vast Carboniferous Oil Field.

47.    The Kashagan East Well #3 encountered highly marketable 42-44° API gravity light oil with no oilwater contact and only a 10 foot natural gas cap. Based on OKIOC's $368 Million seismic survey of the northeastern Caspian Sea, Kashagan's structure is 130 kilometers long by 25 kilometers wide, which is 3,250 square kilometers and equivalent to 802,750 acres, which makes it one of the world's largest existing oil productive reef structures.

48.    BG had full knowledge of further exploratory wells before the decision to sell was made, including a Kairan well, the Aktota well, five (5) wells in Kashagan East, two (2) wells in Kashagan West, a Kalamkas well, and a well in Kashagan-South West. In addition, a man-made island was constructed in the Caspian Sea, for one of the wells in Kashagan East. A plethora of information from test wells about the tremendous value of the Greater Kashagan Field was available to BG at all times.

49.    In addition, there are three (3) other satellite structures, the Kairan, the Aktota, and the Kashagan South-West between Kashagan, and Kashagan-South West and Kalamkas B of Kashagan, all of which are part of the Consortium, and would further add to the recoverable oil reserves and daily oil production potential of the Greater Kashagan area of interest, based on extensive seismic and well test results available to BG at the time of the sale and because of all the information it possesses from the Karachaganak Field, which is producing from the Carboniferous, and actually tested oil from at least three (3) Devonian wells.

50.    Oil industry estimates project that the Greater Kashagan Field could hold up to 30

billion barrels of recoverable crude oil and 70 trillion cubic feet of associated natural gas. Put into perspective, the Greater Kashagan Oil Field is the largest oil field discovered in the last 60 years, and is over two (2) times the size of the giant Prudhoe Bay discovery in Alaska. The United States State Department estimated the Caspian Sea could hold 200 billion barrels of recoverable oil, more than the reserves of either Iran or Kuwait.

51.     Neither did BG decide to leave the Kazakhstan area entirely, because it continues to maintain large operations in northern onshore Kazakhstan, the Karachaganak Field. Thus, any excuse for selling its interest at a depressed price to the other OKIOC members seems both unorthodox and illogical, and without valid business purposes.

52.     Based on a press release by the President of Kazakhstan, Nursultan A. Nazarbayev, the Greater Kashagan Oil Field is expected to produce from the Carboniferous 8 million barrels of oil a day which means 1.333 million barrels of oil per day to be BG's share. It is unbelievable that BG would voluntarily relinquish such a unique opportunity, directly harming its own shareholders, unless unrecorded swaps or transactions, in violation of U.S. and European laws, were part of the deal.

53.     After April 9, 2005 (the date of the sale), and until recently, the price of oil and gas had steadily trended upward since 1999. At the time there was no justification for downgrading BG's interest to a liquidation sales price. Although the price of oil has declined to below $50 USD per barrel recently, it is expected to return to its above $80 price well before 2015.

54.     BG's sale of its interest in the Greater Kashagan Oil Field and the OKIOC consortium for a mere $1.8 billion is a gross waste of corporate assets. Merrill Lynch, one of BG's investment bankers, concluded that foreign oil is sold for $5 a barrel of recoverable oil in the ground. Assuming, very conservatively, that Greater Kashagan contains only 9 billion barrels of recoverable oil (*See* April 2005 Wood Mackenzie Report on Kashagan, p. 13), the present value of BG's share in OKIOC (1.5 billion barrels) could exceed $7.5 billion. The Merrill Lynch

estimate, however is out of date and today's estimate, which expects the price of oil to reach $80 per barrel in one to two years, would easily exceed $10 a barrel of recoverable oil in the ground, making the value of BG's share in excess of $15 billion.

55.    Calculating BG's share of OKIOC's 1.6 million barrels a day to be produced in 2015, at approximately 266,666 barrels a day, this would give BG a gross return of $21,333,000.00 a day from its interest in the Greater Kashagan Oil Field, if using the price of at least $80 for a barrel of oil sold in the market in 2015. Calculated for a one-year period, the amount would be $7.8 billion a year, or a 2.8 month payout of the $1.8 billion sales price, making it a giveaway.

56.    After walking away from the proven potential of the shallow (15-foot) waters of the offshore Greater Kashagan Field, Defendants then invested in subsalt exploration, offshore Brazil prospects, requiring an investment of approximately $300 million per well at water depths of 9,000 feet, which is clearly devoid of logic or valid business purpose.

### Criminal Conspiracy

57.    The criminal conspiracy among multinational companies, including BG, and certain highly placed individuals in the Kazakhstan Government, appears in Paragraphs 65, 66, 69, 71, 75, 77 and 81 of the attached James H. Giffen Indictment, which is expressly incorporated herein, as is the May 12, 2008 *Wall Street Journal* article cited above. These predicate acts sound in bribery, money laundering, Travel Act violations, mail fraud, and wire fraud. Specifically, the predicate acts include without limitation.

- On or about May 4, 1998, Defendants and other co-conspirators including Giffen caused $5 million to be transferred to an account controlled personally by a Senior Kazakhstan Government official.  Giffen Indictment ¶ 65(DD);

- On or about May 4, 1998, Defendants and other co-conspirators including Giffen caused $2.5 million to be transferred to an account controlled personally by a Senior Kazakhstan Government official, who's identity is not presently known, but who is a different

official than the official referred to in the preceding bullet point. Giffen Indictment ¶ 65(EE);

- On or about June 29, 1998, Defendants and other co-conspirators including Giffen caused approximately $350,000 to be transferred to Giffen and an account controlled personally by a Senior Kazakhstan Government official. Giffen Indictment ¶65(FF);

- On or about July 9, 1998, Defendants and other co-conspirators including Giffen caused approximately $150,000 to be transferred to Giffen and an account controlled personally by a Senior Kazakhstan Government official; Giffen Indictment ¶ 65 (ff).

Each of these acts constitute illegal wire fraud. See 18 U.S.C. Sections 1343 and 1346. Moreover, on information and belief, additional predicate acts arose in the subsequent cover up, and sound in tax fraud (for reporting the bribes as legitimate expenses and therefore paying less in income taxes), and mail/wire fraud (for deliberately misrepresenting the nature of the bribery payments to Plaintiffs).

## V. <u>DERIVATIVE ALLEGATIONS</u>

58.     Plaintiff brings this action derivatively on behalf of and for the benefit of the company and its shareholders to remedy the wrongdoing alleged herein. BG and its shareholders were damaged by Defendants' acts and omissions described herein and continue to be damaged to the date of the filing of this Complaint, and in the future. The wrongs committed by the Defendants are part of a continuing course of action perpetrated by the Defendants.

59.     Plaintiff, at all times relevant hereto, was and remains a shareholder of BG.

60.     Plaintiff will fairly and adequately represent the interests of the BG Shareholders and the Company and has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

61.     This action is brought to remedy violations of criminal, statutory, and common law and regulations, as alleged herein, on behalf of the Company and its Shareholders.

62.     This action is not a collusive one to confer jurisdiction on this Court, which it

would not otherwise have.

63.     Grynberg informed the Board of Directors by correspondence in March, 2009 of these derelictions of their fiduciary responsibilities and received no adequate response. *See* Exhibit 5.

## VI. DEFENDANTS' DUTIES AS OFFICERS AND DIRECTORS OF THE COMPANY

64.     As officers and directors of BG, Defendants were charged with performing their duties in good faith and with the degree of care that an ordinarily prudent person serving as an officer or director of a corporation would use under similar circumstances. In performing their duties, Defendants were required to reasonably inform themselves before making a business judgment. Defendants were charged with the duty of reasonable inquiry and cannot exempt themselves from liability by failing to do more than passively rubber-stamp the decisions of the Company's senior management.

65.     Defendants owed the Company duties of loyalty to act in the best interests of the Company and its Shareholders and to refrain from self-dealing. Defendants were thus obligated to refrain from acting to benefit, themselves at the expense of, and to the detriment of the Company.

66.     Defendants have engaged in unlawful activities exposing the Company and, ultimately, its shareholders, to punitive sanctions and fines imposed by the U.S. and British Governments, as well as the European Community, if the lax internal audit system within the Company which has thus far tolerated these grossly unlawful acts is not corrected and barred from every occurring again.

67.     As detailed herein, Defendants breached these responsibilities and obligations. BG and its shareholders were damaged by Defendants' acts and omissions described herein and continue to be damaged to the date of the filing of this Complaint, and in the future. The wrongs committed by the Defendants are part of a continuing course of action perpetrated by the Defendants.

## VII. CLAIMS FOR RELIEF

### COUNT I – BREACH OF FIDUCIARY DUTY

68.     Plaintiff incorporates by reference and reallege each and every allegation in paragraphs 1 through 65, as if fully set forth herein.

69.     Each Defendant owed the Company and its Shareholders the highest duties of loyalty, honesty and care in conducting their affairs.

70.     At a minimum, to discharge these duties, each Defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of the Company. By virtue of these obligations, each Defendant was required, *inter alia* to:

(a)     exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company;

(b)     be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

(c)     conduct the affairs of the Company is a manner which provides the highest quality products and services and to maximize the profitability of the Company for the benefit of its Shareholders.

71.     Defendants knowingly, intentionally or recklessly, breached their fiduciary duties by, *inter alia*: (a) participating in illegal and criminal bribery schemes; (b) providing, either directly or indirectly, unconscionable, illegal and criminal payments to certain highly placed Kazakhstan Government officials; (c) failing to comply with reasonable procedures and controls to supervise the Company's officers and employees responsible for conducting overseas business transactions; (d) failing to implement and maintain adequate, internal watchdog controls to monitor overseas transactions; (f) engaging in illegal activity to benefit themselves at the

18

expense of the Company and its Shareholders, including the possible future criminal prosecution of the Company, and/or engaging in willful ignorance towards these widely-publicized activities in the region and their possible ramifications.

72.     Accordingly, Plaintiff, as a shareholder representative of the Company, seeks, on behalf of the Company, monetary damages, injunctive remedies; and other forms of relief including removal of the responsible directors, officers and other fiduciaries. BG and its shareholders were damaged by Defendants' acts and omissions described herein and continue to be damaged to the date of the filing of this Complaint, and in the future. The wrongs committed by the Defendants are part of a continuing course of action perpetrated by the Defendants.

## COUNT II – INDEMNIFICATION

73.     Plaintiff incorporates by reference and reallege each and every allegation in paragraphs 1 through 70, as if fully set forth herein.

74.     As alleged herein, Defendants, acting as officers and/or directors of the Company, and therefore as its agents, breached their fiduciary duties to the Company and its Shareholders.

75.     The Company has suffered significant and substantial injury as a direct result of Defendants' knowing, intentional or reckless breaches of their fiduciary duties as alleged herein.

76.     Plaintiff, as a shareholder of the Company, seeks relief from Defendants on behalf of the Company on the theory of indemnity, to the extent that the Company is found liable for Defendants' violations of their fiduciary duties. BG and its shareholders were damaged by Defendants' acts and omissions described herein and continue to be damaged to the date of the filing of this Complaint, and in the future. The wrongs committed by the Defendants are part of a continuing course of action perpetrated by the Defendants.

## COUNT III – INJUNCTIVE RELIEF

77.     Plaintiff incorporates by reference and reallege each and every allegation in paragraphs 1 through 74, as if fully set forth herein.

78.     Having participated and associated with criminal activities in the Caspian Sea,

offshore and onshore areas, BG should be compelled in the interests of shareholders to immediately begin implementing a fully transparent internal watchdog system, to ensure that the massive penalties levied against other multinational players in the Caspian Sea area are not levied against BG.

79.     Such internal watchdog system should emulate, as much as possible, the one established by StatoilHydo (see Pages 8-11 above) to serve as a barrier against future FCPA violations, and consist of the following:

    (a)  Maintain independent compliance consultant.

    (b)  Cooperate fully with compliance consultant.

    (c)  Compliance consultant to assess whether BG policies and procedures are reasonably designed to *detect and prevent* violations of FCPA.

    (d)  Compliance consultant shall be required to furnish a written report within 120 calendar days.

    (e)  Within 120 days after receiving report BG shall adopt all recommendations.

    (f)  Compliance consultant shall undertake two follow up reviews.

    (g)  Compliance consultant shall formulate conclusions.

    (h)  Compliance consultant shall report any evidence of bribery to corporate compliance officer and this Court; BG shall not retaliate for such disclosures.

    (i)  The compliance consultant shall conduct no other business with BG and shall have a fixed two-year term of employment; BG shall not terminate said compliance consultant without written approval of this Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring that Defendants have breached their fiduciary duties as alleged herein;

B.      Directing Defendants, jointly and severally, to account for all losses and or damage; sustained by the Company by reason of the acts and omissions complained of herein;

C.      Requiring Defendants to remit to the Company all of their salaries, bonuses and other compensation received for the periods during which they breached their duties as alleged herein;

D.      Ordering Defendants, and those under their supervision and control, to refrain from further violations of fiduciary duties as arc alleged herein;

E.      Awarding pre-judgment and post-judgment interest as allowed by law;

F.      Awarding Plaintiff's attorney fees, expert fees and other costs and expenses; and

G.      Granting such other and further relief as this Court may deem just and proper.

## IX. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

THE LAW OFFICES OF
EDWARD SHARKANSKY


_____
Edward Sharkansky
1308 Belmont Street
Brockton, MA 02301
Telephone: 508-587-7977
Facsimile: 508-587-5455

Dated:  April 8, 2009                                        BBO No. 600304